ADAM I. GAFNI (CA Bar # 230045)
ROSY S. MEYEROWITZ (CA Bar # 265707)
WOOLF GAFNI & FOWLER LLP
10850 Wilshire Blvd, Suite 510
Los Angeles, California 90024
Tel:  310-474-8776
Fax:  310-919-3037
Email: adam.gafni@wgfllp.com

Attorneys for Plaintiff, BARRY ROSEN

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARRY ROSEN,<br><br>          Plaintiff,<br><br>          vs.<br><br>AMAZON.COM, INC., and DOES 1 TO 10,<br><br>          Defendants. | ) Case: 14-cv-02115-ABC-E<br>) Related Case: 12-cv-10413-ABC-E<br>)<br>)<br>) [Assigned to the Hon. Audrey B.<br>) Collins]<br>)<br>) **PLAINTIFF BARRY ROSEN'S**<br>) **REQUEST FOR JUDICIAL**<br>) **NOTICE AND DECLARATION OF**<br>) **ADAM I. GAFNI IN SUPPORT OF**<br>) **PLAINTIFF'S OPPOSITION TO**<br>) **DEFENDANT'S MOTION TO**<br>) **DISMISS COMPLAINT UNDER**<br>) **RULE 12(b)(6)**<br>)<br>)<br>) Action Filed: March 20, 2014<br>)<br>) Hearing Date: June 2, 2014<br>) Hearing Time: 10:00 a.m.<br>) Department:  Courtroom 680 |

TO THE COURT, COUNSEL, AND ALL PARTIES OF RECORD:

Plaintiff Barry Rosen ("Rosen" or "Plaintiff") hereby requests that the Court take

judicial notice of the following documents attached as Exhibits 1 and 2.  This

request is made in connections with the Plaintiff's Opposition to Defendant

Amazon.Com, Inc.'s Motion to Dismiss Complaint Under Rule 12(b)(6)

| EXHIBIT | DISCRIPTION |
|---------|-------------|
| 1 | Federal Register /Vol. 79, No. 37 /Tuesday, February 25, 2014 Notices United States Copyright Office [Docket No. 2014–2] Study on the Right of Making Available; Comments and Public Roundtable |
| 2 | The Right of Making Available, Submitted by The Software & Information Industry Association to the United States Copyright Office at 14-15 (2014),http://www.copyright.gov/docs/making_available/comments/docket2014_2/SIIA.pdf |

With regard to Exhibit "1," under Federal Rule of Evidence, the Court may

properly take judicial notice of the decisions or orders of administrative agencies,

such as the United States Copyright Office. *See, Lundquist v. Continental Casualty*

*Co.,* 394 F.Supp.2d 1230 (C.D.Cal.2005)(judicial notice taken of California

Department of Insurance revocation of approval of discretionary clauses in

disability insurance clauses as impacting the standard of review in ERISA

disability cases).

With Regard to Exhibits 1 and 2, the Court may take judicial notice of the

statements by the U.S. Copyright Office and submissions to the Copyright Office

because the statements are either contained in the Federal Register or are available

from publically available records such that they "can be accurately and readily

determined from sources whose accuracy cannot reasonably be questioned" and

are generally known. FRE 201(b).  Courts routinely take notice of submissions or

records of United States Copyright Office. See, *Pollstar v. Gigmania, Ltd*., 170 F.

Supp. 2d 974, 979 (E.D. Cal. 2000)(Circular published by Copyright Office proper subject of judicial notice).

For the foregoing reasons, Exhibits 1 through 2 may properly be considered by the Court in ruling on AMAZON.COM, INC.'s motion to dismiss.

Respectfully Submitted,

DATED:  May 12, 2014                    WOOLF GAFNI & FOWLER LLP

                                        /s/Adam I. Gafni_____
                                        Adam I. Gafni
                                        Attorneys for Plaintiff
                                        Barry Rosen

## <u>DECLARATION OF ADAM I. GAFNI</u>

1. I am an attorney licensed to practice law before this Court and the Courts of the State of California. If called as a witness, I would and could competently testify from my own personal knowledge as follows:

2. Attached as Exhibit "1" is a true and correct copy of Federal Register /Vol. 79, No. 37 dated Tuesday, February 25, 2014, which is a Notice from the United States Copyright Office [Docket No. 2014–2] entitled "Study on the Right of Making Available; Comments and Public Roundtable" which I downloaded from the U.S. Copyright Office website:
   http://www.copyright.gov/fedreg/2014/79fr10571.pdf

3. Attached as Exhibit "2" is a true and correct copy of The Software & Information Industry Association's April 4, 2014 submission to United States Copyright Office, I downloaded from the United States Copyright Office's website:
   http://www.copyright.gov/docs/making_available/comments/docket2014_2/SIIA.pdf. I note that many reports and comments are available at http://www.copyright.gov/docs/making_available/comments/docket2014_2/

   I declare under the laws of the United States of America that the foregoing is true and correct. Executed this day, the 12th of May 2014 at Los Angeles, California.

   /s/Adam I. Gafni_____
   Adam I. Gafni

# EXHIBIT 1

## LIBRARY OF CONGRESS

### United States Copyright Office

[Docket No. 2014–2]

**Study on the Right of Making Available; Comments and Public Roundtable**

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Request for comments and notice of public roundtable.

**SUMMARY:** The United States Copyright Office is undertaking a study at the request of Congress to assess the state of U.S. law recognizing and protecting "making available" and "communication to the public" rights for copyright holders. The Office is requesting public comments on how the existing bundle of rights under Title 17 covers the making available and communication to the public rights, how foreign laws have addressed such rights, and the feasibility and necessity of amending U.S. law to strengthen or clarify our law in this area. The Copyright Office also will hold a public roundtable to discuss these topics and to provide a forum for interested parties to address the issues raised by the comments received.

**DATES:** Comments are due on or before April 4, 2014. The public roundtable will be held on May 5, 2014, from 9:00 a.m. to 5:00 p.m. EDT.

**ADDRESSES:** All comments should be submitted electronically. To submit comments, please visit *http://www.copyright.gov/docs/making_available/*. The Web site interface requires submitters to complete a form specifying name and organization, as applicable, and to upload comments as an attachment via a browser button. To meet accessibility standards, commenting parties must upload comments in a single file not to exceed six megabytes ("MB") in one of the following formats: The Portable Document File ("PDF") format that contains searchable,accessible text (not an image); Microsoft Word; WordPerfect; Rich Text Format ("RTF"); or ASCII text file format (not a scanned document). The form and face of the comments must include both the name of the submitter and organization. The Office will post all comments publicly on the Office's Web site exactly as they are received, along with names and organizations.

The public roundtable will take place in the Copyright Office Hearing Room, LM–408 of the Madison Building of the Library of Congress, 101 Independence Avenue SE., Washington, DC 20559. The Copyright Office strongly prefers that requests for participation be submitted electronically. A participation request form will be posted on the Copyright Office Web site at *http://www.copyright.gov/docs/making_available/* on or about April 7, 2014. If electronic submission of comments or requests for participation is not feasible, please contact the Office at 202–707–1027 for special instructions.

**FOR FURTHER INFORMATION CONTACT:** Maria Strong, Senior Counsel for Policy and International Affairs, by telephone at 202–707–1027 or by email at *mstrong@loc.gov,* or Kevin Amer, Counsel for Policy and International Affairs, by telephone at 202–707–1027 or by email at *kamer@loc.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

The WIPO Internet Treaties—the WIPO Copyright Treaty("WCT")[1] and the WIPO Performances and Phonograms Treaty ("WPPT")[2]— require member states to recognize the rights of "making available" and "communication to the public" in their national laws. The treaties obligate member states to give authors of works, producers of sound recordings, and performers whose performances are fixed in sound recordings the exclusive right to authorize the transmission of their works and sound recordings, including through interactive platforms, such as the Internet, where the public can choose where and when to access them. In the specific context of interactive, on-demand situations, WCT Article 8 and WPPT Articles 10 and 14 provide treaty members with flexibility in the manner in which they implement this right.[3]

The United States implemented the WIPO Internet Treaties through the Digital Millennium Copyright Act ("DMCA") in 1998.[4] Based on advice received from the Copyright Office, among many other experts, Congress did not amend U.S. law to include explicit references to "making available" and "communication to the public," concluding that Title 17 already provided those rights.[5] As former Register of Copyrights Marybeth Peters observed:

> While Section 106 of the U.S. Copyright Act does not specifically include anything called a "making available" right, the activities involved in making a work available are covered under the exclusive rights of reproduction, distribution, public display and/or public performance. . . . Which of these rights are invoked in any given context will depend on the nature of the "making available" activity.[6]

Indeed, both Congress and the Executive Branch have continued to support this view since the enactment of the DMCA.[7]

---

Intellectual Property Organization, Guide to the Copyright and Related Treaties Administered by WIPO and Glossary of Copyright and Related Rights Terms 209 (2003) (WCT Article 8's umbrella solution allows treaty members to implement the making available right through "a right other than the right of communication to the public or through the combination of different rights"); *id.* at 247–48 (WPPT Articles 10 and 14 apply umbrella solution "in a fully fledged manner incorporating the neutral description of interactive digital transmissions directly").

[4] Public Law 105–304, 112 Stat. 2860 (1998).

[5] *See* H.R. Rep. No. 105–551, at 9 (1998) ("The treaties do not require any change in the substance of copyright rights or exceptions in U.S. law."); *see also WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act: Hearing on H.R. 2281 & H.R. 2180 Before the H.R. Subcomm. on Courts and Intellectual Property of the Comm. on the Judiciary,* 105th Cong. 43 (1997) (Register of Copyrights advised Congress that there was "no need to alter the nature and scope of the copyrights and exceptions, or change the substantive balance of rights embodied in the Copyright Act"). More recent research into the legislative history of U.S. law by Professor David Nimmer and Professor Peter Menell has provided additional textual support regarding Congress's views on the breadth of existing U.S. law and the broad scope of the making available right. *See Melville B. Nimmer & David Nimmer,* 2 Nimmer On Copyright § 8.11 (2012); Peter S. Menell, *In Search of Copyright's Lost Ark: Interpreting the Right to Distribute in the Internet Age,* 59 J. Copyright Soc'y U.S.A. 1, 50–51 (2011).

[6] *Piracy of Intellectual Property on Peer-to-Peer Networks: Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property of the H. Comm. on the Judiciary,* 107th Cong. 114 (2002) (letter from Marybeth Peters, Register of Copyrights, United States Copyright Office).

[7] *See* Internet Policy Task Force, U.S. Dep't of Commerce, Copyright Policy, Creativity, and Innovation in the Digital Economy 15–16 (2013), *available at http://www.uspto.gov/news/publications/copyrightgreenpaper.pdf* (noting that Copyright Act's distribution right was intended to include "the mere offering of copies to the public" and that contrary judicial decisions "predate . . .

Continued

---

[1] WIPO Copyright Treaty art. 8, Dec. 20, 1996, 36 I.L.M. 65 ("Without prejudice to the provisions of Articles 11(1)(ii), 11*bis*(1)(i) and (ii), 11*ter*(1)(ii), 14(1)(ii) and 14*bis*(1) of the Berne Convention, authors of literary and artistic works shall enjoy the exclusive right of authorizing any communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them.") (text of Agreed Statement omitted). WCT Article 8 is entitled "Right of Communication to the Public."

[2] WIPO Performances and Phonograms Treaty arts. 10, 14, Dec. 20, 1996, 36 I.L.M. 76. Articles 10 and 14 provide the making available right to performers whose performances are fixed in sound recordings (phonograms) and to producers of sound recordings. The separate "communication to the public" provision in the WPPT (Article 15) involves a right of remuneration, and is not the same "communication to the public" right found in the Berne Convention and WCT Article 8.

[3] This flexible approach is known as the "umbrella solution." *See* Mihály Ficsor, *World*

The lack of explicit references to these rights in U.S. law, however, has led some courts and commentators to express uncertainty over how the existing rights in Title 17 may apply to various methods of making of copyrighted works available to the public, including in the digital environment. Especially in the Internet era, in any given case several of these rights (reproduction, distribution, public performance, and public display) may be at issue, depending on the facts involved.

Courts, academics, and practitioners particularly have focused on the scope of the distribution right under Section 106 and have debated whether it fully encompasses the making available of a copyrighted work without proof of an actual distribution.[8] For example, two early Eighth and Fourth Circuit cases discussing making available yielded conflicting results. The Eighth Circuit in *National Car Rental System, Inc.* v. *Computer Associates International, Inc.* rejected the notion that making a work available without more violated the distribution right.[9] The principal authority to the contrary is the Fourth Circuit's decision in *Hotaling* v. *Church of Jesus Christ of Latter-Day Saints,* in which the defendants made several unauthorized microfiche copies of genealogical research materials, one of which ended up in a library collection.[10] The library did not keep records of public use, and therefore there was no evidence of the copy being loaned to the public.[11] The court found that making a work available to the public constituted distribution because "[w]hen a public library adds a work to its collection, lists the work in its index or catalog system, and makes the work available to the borrowing or browsing public, it has completed all the steps necessary for distribution to the public."[12]

A recent Tenth Circuit decision, *Diversey* v. *Schmidly,*[13] followed *Hotaling*'s conclusion that making a work available to the public constitutes distribution under Section 106(3). *Diversey* involved a similar situation to

*Hotaling* and addressed a library lending an unauthorized copy of a work to the public. The Tenth Circuit noted, however, that there has not been consensus on *Hotaling*'s applicability to Internet file-sharing cases, and the court avoided extending its holding to those digital situations.[14]

Other courts have addressed the scope of the distribution right in the online context and have reached similarly conflicting results. The Ninth Circuit in *A&M Records* v. *Napster, Inc.* concluded that distribution encompasses "making available," observing that "Napster users who upload file names to the search index for others to copy violate plaintiffs' distribution rights."[15] Other courts have disagreed and required actual distribution. Thus, the court in *London-Sire Records, Inc.* v. *Doe 1,* which considered infringement of the distribution right through peer-to-peer file sharing, cast doubt on *Hotaling,* asserting that "[m]erely because the defendant has 'completed all the steps necessary for distribution' does not necessarily mean that a distribution has actually occurred."[16] Notably, however, while the *London-Sire* court required actual distribution, it did not require direct evidence of dissemination over peer-to-peer networks, holding instead that a reasonable fact-finder may infer that distribution actually took place where the defendant has completed all necessary steps for a public distribution.[17] Other courts have also relied on the language of Section 106(3) to require actual distribution in order to find a violation of that right.[18]

In sum, while Congress and the Copyright Office have agreed that U.S. law covers the making available right of the WCT, courts have encountered difficulties in evaluating the scope of this interactive right, and the level of evidence needed to establish liability, in the specific cases before them.[19]

In a letter dated December 19, 2013, Representative Melvin L. Watt requested that the Copyright Office "assess the state of U.S. law recognizing and protecting 'making available' and 'communicating to the public' rights for copyright holders. . . . In light of the rapidly changing technology and inconsistency in the various court discussions of these rights . . . it is important that the Copyright Office study the current state of the law in the United States." Specifically, Representative Watt asked the Office to review and assess: "(1) How the existing bundle of exclusive rights under Title 17 covers the making available and communication to the public rights in the context of digital on-demand transmissions such as peer-to-peer networks, streaming services, and music downloads, as well as more broadly in the digital environment; (2) how foreign laws have interpreted and implemented the relevant provisions of the WIPO Internet Treaties; and (3) the feasibility and necessity of amending U.S. law to strengthen or clarify our law in this area."

On January 14, 2014, the House Judiciary Committee's Subcommittee on Intellectual Property, Competition, and the Internet held a hearing during which two witnesses were asked to address the issue of the making available right.[20] These witnesses expressed a variety of views on whether current U.S. copyright law provides sufficient clarity on this issue and whether adding an explicit making available right to Title 17 would

---

[8] The Section 106 distribution right is far broader than the new distribution right afforded under the WIPO Treaties (WCT art. 6 and WPPT arts. 8, 12).

[9] 991 F.2d 426, 430 (8th Cir. 1993) ("[W]e cannot conclude that an allegation that National 'permitted the use' necessarily amounts to an allegation of the actual distribution of a copy of the program.").

[10] 118 F.3d 199, 202 (4th Cir. 1997).

[11] *Id.* at 203.

[12] *Id.*

[13] *Diversey* v. *Schmidly,* No. 13–2058, 2013 U.S. App. LEXIS 25506, at *12–13 (10th Cir. Dec. 23, 2013).

[14] *Id.* at *13–14 n.7.

[15] *A&M Records, Inc.* v. *Napster, Inc.,* 239 F.3d 1004, 1014 (9th Cir. 2001); *see also Universal City Studios Prods. LLLP* v. *Bigwood,* 441 F. Supp. 2d 185, 190 (D. Me. 2006) ("[B]y using KaZaA to make copies of the Motion Pictures available to thousands of people over the internet, Defendant violated Plaintiffs' exclusive right to distribute the Motion Pictures."); *Warner Bros. Records, Inc.* v. *Payne,* 2006 U.S. Dist. LEXIS 65765, at *8 (W.D. Tex. 2006) ("Listing unauthorized copies of sound recordings using an online file-sharing system constitutes an offer to distribute those works, thereby violating a copyright owner's exclusive right of distribution.").

[16] 542 F. Supp. 2d 153, 168 (D. Mass. 2008) (quoting *Hotaling,* 118 F.3d at 203).

[17] *Id.* at 169.

[18] *See Capitol Records, Inc.* v. *Thomas,* 579 F. Supp. 2d 1210, 1218 (D. Minn. 2008) (concluding it was bound by the holding in *National Car* and stating that although "the Copyright Act does not offer a uniform definition of 'distribution' . . . Congress's choice to not include offers to do the enumerated acts or the making available of the work indicates its intent that an actual distribution or dissemination is required in § 106(3)"); *Atlantic Recording Corp.* v. *Howell,* 554 F. Supp. 2d 976, 983 (D. Ariz. 2008) ("The statute provides copyright holders with the exclusive right to distribute 'copies' of their works to the public 'by sale or other transfer of ownership, or by rental, lease, or

lending.' Unless a copy of the work changes hands in one of the designated ways, a 'distribution' under § 106(3) has not taken place. Merely making an unauthorized copy of a copyrighted work available to the public does not violate a copyright holder's exclusive right of distribution.").

[19] As noted, in addition to the distribution right, the right of making available also implicates the rights of reproduction, public performance, and public display. The Supreme Court recently grated certiorari in a case involving the scope of the public performance right in the context of online streaming of broadcast television programs. *See Am. Broad. Cos., Inc.* v. *Aereo, Inc.,* 82 U.S.L.W. 3241 (U.S. Jan. 10, 2014) (No. 13–461). Oral argument is scheduled for April 22, 2014.

[20] *See The Scope of Copyright Protection: Hearing Before the Subcomm. on Intellectual Property, Courts, & the Internet of the H. Comm. on the Judiciary,* 113th Cong. (2014), *available at* http://judiciary.house.gov/index.cfm/2014/1/the-scope-of-copyright-protection.

---

recent academic scholarship" on "previously unanalyzed legislative history").

be beneficial.[21] They agreed, however, that current law is properly construed to provide such protection.[22]

## II. Request for Comment

In light of uncertainty among some courts regarding the nature and scope of the making available and communication to the public rights, and to facilitate the study requested by Representative Watt, the Copyright Office seeks public comments on the three main issues listed above. The Office poses additional questions on these three topics below, and requests that commenters identify the questions they are answering in their responses.

### 1. Existing Exclusive Rights Under Title 17

a. How does the existing bundle of exclusive rights currently in Title 17 cover the making available and communication to the public rights in the context of digital on-demand transmissions such as peer-to-peer networks, streaming services, and downloads of copyrighted content, as well as more broadly in the digital environment?

b. Do judicial opinions interpreting Section 106 and the making available right in the framework of tangible works provide sufficient guidance for the digital realm?

### 2. Foreign Implementation and Interpretation of the WIPO Internet Treaties

a. How have foreign laws implemented the making available right (as found in WCT Article 8 and WPPT Articles 10 and 14)? Has such implementation provided more or less legal clarity in those countries in the context of digital distribution of copyrighted works?

b. How have courts in foreign countries evaluated their national implementation of the making available right in these two WIPO treaties? Are there any specific case results or related legislative components that might present attractive options for possible congressional consideration?

### 3. Possible Changes to U.S. Law

a. If Congress continues to determine that the Section 106 exclusive rights

provide a making available right in the digital environment, is there a need for Congress to take any additional steps to clarify the law to avoid potential conflicting outcomes in future litigation? Why or why not?

b. If Congress concludes that Section 106 requires further clarification of the scope of the making available right in the digital environment, how should the law be amended to incorporate this right more explicitly?

c. Would adding an explicit "making available" right significantly broaden the scope of copyright protection beyond what it is today? Why or why not? Would existing rights in Section 106 also have to be recalibrated?

d. Would any amendment to the "making available" right in Title 17 raise any First Amendment concerns? If so, how can any potential issues in this area be avoided?

e. If an explicit right is added, what, if any, corresponding exceptions or limitations should be considered for addition to the copyright law?

If there are any pertinent issues not discussed above, the Office encourages interested parties to raise those matters in their comments.

## III. Public Roundtable

On May 5, 2014, the Copyright Office will hold a public roundtable to hear stakeholder views and to initiate discussion of the three topics identified above. The agenda and the process for submitting requests to participate in the public roundtable will be available on the Copyright Office Web site on or about April 7, 2014.

## IV. Requests To Participate

Requests to participate in the public roundtable should be submitted online at *http://www.copyright.gov/docs/ making_available/*. Nonparticipants who wish to attend and observe the discussion should note that seating is limited and, for nonparticipants, will be available on a first come, first served basis.

Dated: February 20, 2014.

**Maria A. Pallante,**

*Register of Copyrights.*

[FR Doc. 2014–04104 Filed 2–24–14; 8:45 am]

**BILLING CODE 1410-30-P**

## MILITARY COMPENSATION AND RETIREMENT MODERNIZATION COMMISSION

### Cancellation of a Meeting of the Military Compensation and Retirement Modernization Commission

**AGENCY:** Military Compensation and Retirement Modernization Commission.

**ACTION:** Notice of cancellation of public meetings and town hall meeting.

**SUMMARY:** This notice cancels the hearings and town hall that were to be held on Tuesday, February 25, 2014.

**DATES:** The public hearings and town hall originally scheduled for Tuesday, February 25, 2014, are cancelled.

**ADDRESSES:** The hearings and town hall were to be held Tuesday, February 25, 2014 at the Embassy Suites Fayetteville Fort Bragg, 4760 Lake Valley Drive, Fayetteville, North Carolina 28303.

**FOR FURTHER INFORMATION CONTACT:** Christopher Nuneviller, Associate Director, Military Compensation and Retirement Modernization Commission, P.O. Box 13170, Arlington VA 22209, telephone 703–692–2080, fax 703–697–8330, email *christopher.nuneviller@mcrmc.gov*.

**SUPPLEMENTARY INFORMATION:** A notice of public hearings and town hall meeting that appeared in the **Federal Register** on February 18, 2014 (79 FR 9285) announced that the Military Compensation and Retirement Modernization Commission (Commission) was to hold public hearings and a town hall meeting on Tuesday, February 25, 2014, to seek the views of service members, retirees, their beneficiaries and other interested parties regarding pay, retirement, health benefits and quality of life programs of the Uniformed Services. The Commission was to also hear from senior commanders of local military commands and their senior enlisted advisors, unit commanders and their family support groups, local medical and education community representatives, and other quality of life organizations.

The public hearings and town hall meeting will be rescheduled for a later date.

**Christopher Nuneviller,**

*Associate Director, Administration and Operations.*

[FR Doc. 2014–04126 Filed 2–24–14; 8:45 am]

**BILLING CODE P**

---

[21] *See* Statement of David Nimmer, Professor, UCLA School of Law, *The Scope of Copyright Protection, supra* note 20 ("Nimmer Statement"); Statement of Glynn S. Lunney, Jr., Professor, Tulane University School of Law, *The Scope of Copyright Protection, supra* note 20 ("Lunney Statement"). These witness statements are available at *http:// docs.house.gov/Committee/Calendar/ ByEvent.aspx?EventID=101642*.

[22] *See* Nimmer Statement at 2–3; Lunney Statement at 1–4.

# EXHIBIT 2

# Comments on

# THE RIGHT OF MAKING AVAILABLE

# Submitted By

# THE SOFTWARE & INFORMATION INDUSTRY ASSOCIATION
# to
# THE UNITED STATES COPYRIGHT OFFICE

## April 4, 2014

## INTRODUCTION

The Software & Information Industry Association ("SIIA") respectfully submits these comments to the United States Copyright Office in response to the Notice entitled "Study on the Right of Making Available; Comments and Public Roundtable" published in the Federal Register on February 25, 2014 (79 Fed. Reg. 10571).

SIIA is the principal trade association of the software and information industries and represents over 800 companies that develop and market software and digital content for business, education, consumers, the Internet, and entertainment.[1]  SIIA's members range from start-up firms to some of the largest and most recognizable corporations in the world.  SIIA member companies are leading providers of, among other things:

  • software publishing, graphics, and photo editing tools

---

[1]  A list of the more than 800 SIIA member companies may be found at:
http://www.siia.net/membership/memberlist.asp.

- corporate database and data processing software

- financial trading and investing services, news, and commodities exchanges

- online legal information and legal research tools

- protection against software viruses and other threats

- education software and online education services

- open source software

- and many other products and services in the digital content industries

One of SIIA's primary missions is to protect the intellectual property of member companies, and advocate a legal and regulatory environment that benefits the software and digital content industries. Consistent with these goals, for over thirty years SIIA has engaged in a comprehensive, industry-wide campaign to advocate a legal regime in the United States and abroad that adequately and effectively protects the intellectual property rights of its software and content industry members.

SIIA members represent a wide range of business and consumer interests. They are copyright owners and users. Many SIIA members also distribute and help others locate copyrighted works. As a result, SIIA and its members are extremely interested in working with the Copyright Office on the legal issues involving the right of making available as they are considered by the Office.[2]

Pursuant to the Copyright Office's inquiry on making available, we reviewed the international obligations of the United States as they relate to the right of making available as well as the relevant provisions provided under U.S. law. We then undertook an extensive review of the vast amount of court decisions interpreting and applying the statutory provisions in the context of acts of making available, as well as reviewing other secondary sources.

Based on this review, we conclude that the act of making available is adequately and effectively addressed under U.S. law through the exclusive right of distribution and a combination of the

---

[2]  All references to "making available" in these comments (except when discussing the court cases in section III) are intended to include acts of communication to the public as well.

exclusive rights of reproduction, public performance[3] and public display in section 106 of the Copyright Act; theories of secondary liability applied by the courts under the copyright law; the anti-circumvention provisions in section 1201 of the Digital Millennium Copyright Act (DMCA); other federal laws, such as the Computer Fraud and Abuse Act (CFAA), and various state laws.  We do not believe that legislation or any type of further Congressional clarification is needed to provide for a making available right under U.S. law.

## I.   INTERNATIONAL OBLIGATIONS RELATING TO THE MAKING AVAILABLE RIGHT

The United States belongs to numerous international agreements that require the United States to provide copyright owners from countries that have joined these agreements with a right of making available.  None of these agreements defines what it means to provide a right of making available.  They do not define the type of acts that would constitutes an act of making available or what factors a country should consider in determining the scope of the right.  As a result, while the United States is obligated to provide a right of making available, the scope of that right is left fairly ambiguous.  A summary of these international agreements and their relevant provisions – or lack thereof – is provided below.

### A.  *Berne Convention for the Protection of Literary and Artistic Works*

The Berne Convention for the Protection of Literary and Artistic Works (Berne Convention) requires its signatories to recognize the copyright of works of authors from other signatory countries.  It requires member states to provide strong minimum standards for copyright law.  As

---

[3] SIIA members comprise software and digital content companies who produce information and technology products and services that rarely implicate the performance right in section 106(4) of the Copyright Act. Accordingly, while there are many cases and other resources interpreting the proper scope of the performance right, our comments will focus primarily on the exclusive rights of distribution, reproduction, and display and leave it to those in the entertainment copyright community to address how acts of making available are subsumed by the performance right.

of September 2013, there are 167 states that are parties to the Berne Convention, including the United States.[4]

The provisions of the Berne Convention most relevant to the Copyright Office study are Articles 11, 11*bis*, and 11*ter*.  Articles 11 and 11*bis*, provide for a public performance and communication right for dramatic and musical works.  Article 11*ter* provides "[a]uthors of literary works [with] the exclusive right of authorizing: (i) the public recitation of their works, including such public recitation by any means or process; (ii) any communication to the public of the recitation of their works."  There is no right of making available provided for in the Berne Convention.

### B.  Trade-Related Aspects of Intellectual Property (TRIPs)

The TRIPs Agreement is an international agreement administered by the World Trade Organization (WTO) that establishes minimum standards for many forms of intellectual property as applied to nationals of other WTO Members.  The TRIPs Agreement is considered to be the most comprehensive international agreement on intellectual property to date.  Nevertheless, the agreement contains no right of making available.  The only provision relatively close is the provision relating to communication of television broadcasts in Article 14.

### C.  WIPO Copyright Treaty (WCT)

The WCT is a special agreement under the Berne Convention.  All Contracting Parties to the WCT must comply with the substantive provisions of the Paris Act of the Berne Convention.  For purposes of determining the obligations of the United States relating to the right of making available this is the most relevant of all the international intellectual property agreements.  The most relevant provisions of the WCT are:

> Article 6:  Article 6, titled "Right of Distribution," provides that: "Authors of literary and artistic works shall enjoy the exclusive right of authorizing the *making available*

---

[4]  See http://en.wikipedia.org/wiki/List_of_parties_to_international_copyright_agreements for a list of all countries that are members of the Berne Convention, TRIPs and the WCT.

*to the public* of the original and copies of their works through sale or other transfer of ownership." (emphasis added)

The agreed statement concerning Articles 6 is especially important to note here because it further defines and narrows the application of the Article. It states that: "…the expressions "copies" and "original and copies," being subject to the right of distribution … under the said Article[], refer[s] exclusively to fixed copies that can be put into circulation as tangible objects." While the article does require the United States to provide for a right of making available, it appears to be limited to tangible copies. It has the further restriction that these fixed copies must be of the type that "can be put into circulation." As a result, while a segment of hard drive may be considered (under U.S. law) to qualify as a tangible copy for purposes of digital transmission of copies, it is unlikely to meet this circulation requirement.

Article 8:  Article 8, titled "Right of Communication to the Public," provides: ... "authors of literary and artistic works shall enjoy the exclusive right of authorizing any communication to the public of their works, by wire or wireless means, including *the making available to the public* of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them." (emphasis added)  The agreed statement concerning Article 8 explains that "[i]t is understood that the mere provision of physical facilities for enabling or making a communication does not in itself amount to communication within the meaning of this Treaty or the Berne Convention." This article does not contain the limitations that are contained in Article 6, and would therefore require the United States to provide a right of making available.

### D.  WIPO Performances and Phonograms Treaty (WPPT)

Unlike the broadly applicable WCT, the WPPT solely covers the intellectual property rights of performers and producers of phonograms. The WPPT requires that performers be granted four economic rights in their performances that are fixed in phonograms, including a right of

distribution and a right of making available.  The right of distribution, as provided in Article 8, is defined in the WPPT as the right to authorize "the *making available to the public* of the original and copies of the phonogram through sale or other transfer of ownership."  (emphasis added).  An agreed statement contains language limiting the applicability of Article 8, just as in the WCT.  The right of making available is defined in Article 10 as the right to authorize "the making available to the public, by wire or wireless means, of any performance fixed in a phonogram, in such a way that members of the public may access the fixed performance from a place and at a time individually chosen by them."  This right is intended to cover on-demand, interactive making available through the Internet.[5]

Similar to the rights accorded to performers, the Treaty also requires that producers of phonograms be granted rights of distribution and of making available.  The right of distribution is defined in Article 12 as the right to authorize "the making available to the public of the original and copies of the phonogram through sale or other transfer of ownership."  The right of making available is defined in Article 14 as the right to authorize "the making available to the public the phonogram, by wire or wireless means, in such a way that members of the public may access the phonogram from a place and at a time individually chosen by them."

### E.  Free Trade Agreements

The United States has entered various Free Trade Agreements (FTAs) that require the it to provide a making-available right.  For example, the FTA between the United States and Australia provides that "each Party shall provide to authors the exclusive right to authorise or prohibit the communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them."[6]  It also requires that "each Party shall provide to authors, performers, and producers of phonograms the right to authorise or

---

[5]  See http://www.wipo.int/treaties/en/ip/wppt/summary_wppt.html.

[6]  U.S.-Australia Free Trade Agreement, art. 17.5, May 18, 2004

prohibit the making available to the public of the original and copies of their works, performances, and phonograms through sale or other transfer of ownership."[7]

More specifically, the North America Free Trade Agreement (NAFTA) provides that "each Party shall provide to authors and their successors in interest … the right to authorize or prohibit … the first public distribution of the original and each copy of the work by sale, rental or otherwise…[and] the communication of a work to the public…."(Article 1705)

## II.    U.S. LAW RELATING TO THE MAKING AVAILABLE RIGHT

Acts of making available of copyrighted works without the authorization of the copyright owner are addressed under U.S. law through a combination of the exclusive rights granted to copyright owners under section 106 of the Copyright Act; theories of secondary liability applied by the courts under the copyright law; the anti-circumvention provisions in section 1201 of the Digital Millennium Copyright Act (DMCA); other federal laws, such as the Computer Fraud and Abuse Act (CFAA), and various state laws.  A brief summary of each of these laws is provided below.

### A.    *Exclusive Rights Under Section 106 of the Copyright Act*

The primary means by which the United States satisfies its international obligations relating the right of making available for software and information works is through the U.S. Copyright Act in Title 17, and more specifically in Section 106 of the Act.  Section 106 provides the copyright owner with:

> *the exclusive rights to do and to authorize any of the following:*
>
> *(1) to reproduce the copyrighted work in copies or phonorecords;*
> *…*

---

[7]  U.S.-Australia Free Trade Agreement, art. 17.4, May 18, 2004

*(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;*

*(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;*

*(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.*

As explained in detail below, most instances of making available of software and information works fall within the right of distribution contained in section 106(3) of the Act.  However, the reproduction, display, and performance rights also play a significant role in ensuring U.S. compliance with its international obligations to provide a right of making available.

Although the Copyright Act does not provide any definition of the term "distribution," the definitions that are contained in section 101 of the Act help to complete the understanding of the scope of the distribution right and interplay between all the exclusive rights.  Of particular importance in this regard are the definitions of perform,[8] publication,[9] publicly,[10] display,[11] and transmit.[12]

---

[8]  To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.  17 U.S.C. § 101.

[9]  "Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication. 17 U.S.C. § 101.

[10]  To perform or display a work "publicly" means— (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or (2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of

### B.       *Secondary Liability Under U.S. Copyright Law*

Theories of secondary liability (often referred to as indirect infringement) also play a significant role in determining liability for acts of unauthorized making available of a copyrighted work. Secondary liability for copyright infractions is the product of case law developments and is not contained in the Act itself.[13]   Secondary liability may arise when a person does not commit or participate in the infringing acts him or herself, but materially contributes to, facilitates, induces, or is otherwise responsible for the acts of a third party that infringe one of the exclusive rights in section 106 of the Act.  Significantly for purposes of the Copyright Office study, there must be a direct infringement by someone else in order for secondary liability to be found.

The primary theories of secondary liability are vicarious liability, which occurs when the person has the right and ability to control the infringement, and has a direct financial interest in the infringement, and contributory infringement, which occurs when the person has knowledge of infringing activity and materially contributes to the infringing activity.  A third type of secondary copyright liability was created in 2005 by the Supreme Court in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster Ltd* in response to the massive amounts of infringements taking place over peer-to-peer networks.[14]   This new theory – intentional inducement – occurs when a party doesn't just know about the copyright infringement or contribute to it, but actually takes affirmative steps to foster the infringement by others.

---

[11]  receiving the performance or display receive it in the same place or in separate places and at the same time or at different times. 17 U.S.C. § 101.

[11]  To "display" a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture or other audiovisual work, to show individual images nonsequentially. 17 U.S.C. § 101

[12]  To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent. 17 U.S.C. § 101.

[13]  But see Section 512 of the Copyright Act, which creates a safe harbor for Online Service Providers that references many of the factors that a court would use to determine secondary liability without using the phrase secondary liability or the three theories of liability.

[14]  545 U.S. 913 (2005)

In the context of making available, all three theories of secondary liability can and do arise in the digital environment when a party does not possess the copyrighted work and thus is not making the work available but is otherwise facilitating the act of making available by one of its users by, for example, indexing or directing other users to the infringing work.  For instance in the 2001 *Napster* case (discussed in more detail below) the court found Napster liable on grounds of both vicarious liability (because it had the right and ability to control the infringing acts and directly financially benefited from the availability of the copyrighted works which drew consumers in and increased Napster's ad revenue), and contributory infringement (because the court found that the two-part test for contributory infringement was satisfied and rejected Napster's contention that the *Sony Betamax* "substantially noninfringing uses" exception applied).

There are an abundance of other cases in which one or more of these theories of secondary liability are applied by a court in the context of an act of making available.  But since most of these cases deal more directly with a party who materially contributes to, facilitates or induces the acts of making available of another party – as opposed to the act of making available engaged in by that other party itself – we have limited our discussion and attention (below) to only those cases in which liability of the person who was making the copyrighted work available was also at issue.

### C.      *Section 1201 of the Digital Millennium Copyright Act (DMCA)*

In addition to potentially violating one of the exclusive rights in section 106 – directly or indirectly (through theories of secondary liability) -- some acts of making available may also run afoul of the anti-circumvention prohibitions in section 1201(a)(1)(A) of the DMCA.  Section 1201(a)(1)(A) provides that "No person shall circumvent a technological measure that effectively controls access to a work protected under this title."  The Act defines "circumvent a technological measure" as meaning "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner."[15]  It also defines a technological measure that

---

[15]   17 U.S.C. § 1201(a)(3)(A)

"effectively controls access to a work" as one where "the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work."[16]  For example, if a person is making access codes available in a manner that would enable someone who obtains the code from that person to get *unauthorized* access to a copyrighted work that is stored on a cloud server, that person may be liable for violating the section 1201(a)(1)(A) regardless of whether the underlying act is a violation of any of the exclusive rights in section 106.

### D.     Computer Fraud and Abuse Act (CFAA)

Similar to the anti-circumvention provisions in Section 1201 of the Copyright Act, the Computer Fraud and Abuse Act (CFAA), Title 18, USC 1030, might also be applicable to instances of making available that occur when someone disseminates an access code to a copyrighted work without authorization.  The CFAA specifies seven types of criminal violations, including violations for accessing to defraud and obtain value,[17] damaging a computer or information,[18] and trafficking in passwords.[19]  The CFAA also allows for these violations to be brought for both attempts to commit these crimes and for the bringing civil actions.[20]

To fall within the CFAA's reach, the alleged violator must either access a protected computer without authority or, where the alleged violator is granted limited authority to access the protected computer, he or she must access the protected computer in a way that exceeds the scope of such authorization.[21]  The term "protected computer" is very broadly defined as a computer "which is used in interstate or foreign commerce or communication, including a

---

[16]  17 U.S.C. § 1201(a)(3)(B)

[17]  18 U.S.C. § 1030(a)(4).

[18]  18 U.S.C. § 1030(a)(5).

[19]  18 U.S.C. § 1030(a)(6).

[20]  18 U.S.C. § 1030(g).

[21]  The CFAA does not define "without authorization."  The CFAA defines the term "exceeds authorized access" to mean "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States."[22]

SIIA members and others use the CFAA to deter and prevent unauthorized access to databases, subscription services, and cloud services.  Often these databases and the materials being accessed through these subscription and cloud services are protected by copyright.  For example, a company may provide access to its database of lawyer and law firm information under a license agreement that prohibits the information to be used for sending unsolicited electronic mail or to be scraped to make a competing product.  If another company crawls the database in violation of the license terms, scraps the copyrighted database and makes it available to others, that copyright owner of the database can use the CFAA to pursue a party who violates these license terms on the basis that it has "exceeded authorized access" under the CFAA.  The database owner can also use the CFAA to pursue those who have no license agreement with it (and thus have no authority to access the protected computer) and then access the copyrighted material by circumventing the technical protections used by the copyright owner to prevent non-licensee access.

Cloud computing services encounter similar problems.  When copyright owners make available an access code that enables third parties to access its copyrighted content stored on a cloud service, either without authority or by exceeding whatever limited authority was granted by the copyright owner to the content in the cloud, one of the copyright owner's primary causes of action to protect itself will be the CFAA.  This is true both when the copyrighted content is owned by the cloud service itself and when it is owned and stored in the cloud by the cloud service's customer.

E.    State Law

In additional to the federal statutes identified above, there are several state statutes that play a role in protecting the copyright owner against unauthorized acts of making available.  With regard to copyrighted software and information products and services, the most relevant of these state laws is state contract and trade secret laws.  Virtually all software and most digital

---

[22]  18 U.S.C. § 1030(e)(2)(B).

information products and services are made available through license agreements that set forth the terms and conditions of use and transfer of the software.  Where the terms and conditions contained in the license agreement controls the making available of the licensed product or service and the licensee or other party that is in privity with the licensor violates such term(s), it is likely that the licensor will have an action for breach of contract under state law.

Copyrighted software and some copyrighted information products may also incorporate trade secrets.  When the software is made available in a way that also reveals the trade secrets contained in the software and the revealer is under an obligation or has an agreement with the copyright owner not to disclose the trade secret, an action may lie in state trade secret law against the person who has revealed the trade secret in violation of the obligation or agreement.

Lastly, depending on the scenario, other state laws like state trespass and unfair competition laws may also be applicable in a manner that protects copyright owners against unauthorized making available of their copyrighted works.

## III.    COURT CASES RELATING TO THE MAKING AVAILABLE RIGHT

Since enactment of the 1976 Copyright Act, there have been over twenty court decisions to consider whether a copyright owner's exclusive distribution right in section 106(3) covers acts of making available.  The vast majority of the courts to consider the issue have held that the distribution right does in fact encompass acts of making available.  Most of these cases were decided between 2005 and 2008.

Of the remaining cases in which the courts did not reach the conclusion that the distribution right covers acts of making available, many still found that the unauthorized act of making available could be addressed through other areas of U.S. copyright law, such as through the reproduction, performance or display rights or through theories of secondary copyright liability.  A few other courts considered the issue but either issued an ambiguous decision or affirmatively opted not to

decide the issue.  As  a result, this small group of cases is of no value to the Copyright Office inquiry.

In the few remaining decisions – three to be exact – the court found that an act of making available would not fall within the copyright owner's distribution right.  In two of these cases (*National Rental Car* and *Obolensky*), the problem with these cases is their expansive definition of what it means to make a copyrighted work available.  If one reasonably requires that a making available can only occur if the alleged infringer has the capacity to transfer a copy of the copyrighted work by possessing a copy of the copyrighted work alleged to be infringed then even these cases would be consistent with the other holdings.  Thus, the only real outlier case is the *Howell* case (described below).  In that case, the court incorrectly read a requirement into the statute that a distribution required a transfer of a copy, as opposed to a "transfer of ownership" as specified in section 106(3).

Based on a detailed review of these decisions, it is SIIA's strong view that the act of making available is adequately and effectively addressed under U.S. law through a combination of the exclusive rights in section 106 of the Copyright Act (especially the distribution right), theories of secondary liability applied by the courts under the copyright law, the anti-circumvention provisions in section 1201 of the DMCA, other federal laws, such as the Computer Fraud and Abuse Act (CFAA) and various state laws.

Provided below is a brief summary of each case to address the issue of whether a copyright owner's exclusive distribution right in section 106(3) covers acts of making available.  The case summaries are broken up into four parts:  (1) cases in which a court held that the section 106(3) distribution right encompasses acts of making available; (2) cases in which a court held that the distribution right does not necessarily encompass acts of making available but found that those acts are covered by other parts of the copyright law; (3) cases in which a court failed to adequately explain whether the distribution right encompasses acts of making available; and (4) cases in which a court held that the distribution right does not encompass acts of making available.

### A.  Cases Holding that the Distribution Right Encompasses Making Available

Hotaling v. Jesus Crist of Latter-Day Saints (Fourth Circuit 1997)[23]

Defendant's library maintained an unauthorized copy of the copyright owner's work on microfiche.  The library did not record public use of microfiche and therefore had no evidence as to whether the library ever loaned the microfiche to members of the public.  The Fourth Circuit appellate court held that "when a public library adds a work to its collection, lists the work in its index or catalog system, and *makes the work available* to the borrowing or browsing public, it has completed all the steps necessary for distribution to the public."  (emphasis added)  The court reasoned that "[w]ere this not to be considered distribution within the meaning of section 106(3), a copyright owner would be prejudiced by a library that does not keep records of public use, and the library would unjustly profit by its own omission."

A&M Records v. Napster (Ninth Circuit 2001)[24]

Plaintiff music companies sued well-known peer-to-peer file sharing company, Napster, for secondary liability.  The Ninth Circuit agreed with the lower courts "that plaintiffs have shown that Napster users infringe at least two of the copyright holders' exclusive rights: the rights of reproduction, § 106(1); and distribution, § 106(3).  Napster users who upload file names to the search index for others to copy violate plaintiffs' distribution rights.  Napster users who download files containing copyrighted music violate plaintiffs' reproduction rights."  Thus, the court concluded that by uploading the music files the Napster users were making these files available for download in violation of the 106(3) distribution right.

Perfect 10 v. Amazon (Ninth Circuit 2007)[25]

Copyright owner Perfect 10 sued Google and Amazon for illegally displaying and distributing its copyrighted images.  The court acknowledged that the distribution right could include transmissions of the copyrighted works, but concluded that Google did not possess copies of the

---

[23]  118 F.3d 199 (4th Cir. 1997).

[24]  239 F.3d 1004 (9th Cir. 2001).

[25]  508 F.3d 1146 (9th Cir. 2007).

images and therefore was incapable of making the images available as it was merely directing users to the images.  Specifically, the court found that:

> Google's search engine communicates HTML instructions that tell a user's browser where to find full-size images on a website publisher's computer, but Google does not itself distribute copies of the infringing photographs. *It is the website publisher's computer that distributes copies of the images by transmitting the photographic image electronically to the user's computer.*   As in *Tasini*, the user can then obtain copies by downloading the photo or printing it.…
>
> This "deemed distribution" rule does not apply to Google. Unlike the participants in the Napster system or the library in *Hotaling*, Google does not own a collection of Perfect 10's full-size images and does not communicate these images to the computers of people using Google's search engine. Though Google indexes these images, it does not have a collection of stored full-size images it makes available to the public. Google therefore cannot be deemed to distribute copies of these images under the reasoning of *Napster* or *Hotaling*. Accordingly, the district court correctly concluded that Perfect 10 does not have a likelihood of success in proving that Google violates Perfect 10's distribution rights with respect to full-size images. (emphasis added)

<u>Diversey v. Schmidly (Tenth Circuit 2013)</u>[26]

Copyright owner discovered two unauthorized copies of his dissertation in Defendant's libraries, where they were made available to the public.  Following the *Hotaling* decision, the 10th Circuit found that "[t]he essence of distribution in the library lending context is the work's availability 'to the borrowing or browsing public'" and held that plaintiff's claim for unauthorized distribution accrued when his dissertation was made available in the library's catalog system.

<u>In re Napster Copyright Litigation (Northern District of California 2005)</u>[27]

Defendants in the well-known Napster copyright litigation moved for summary judgment on the basis that plaintiffs could not prove direct infringement as a necessary pre-condition for finding of secondary liability.  In response, plaintiffs proffered several theories of direct infringement as the basis for their secondary infringement claims.  The court denied the first theory, which

---

[26]  738 F.3d 1196 (10th Cir. 2013)

[27]  377 F. Supp. 2d 796, 802-05 (N.D. Cal. 2005)

16

alleged that Napster itself violated plaintiffs' exclusive distribution rights under section 106(3) by indexing MP3 files that its users posted on the Napster network.  In reaching its decision, the court explained that, unlike in *Hotaling* where the library had a copy of the copyrighted work in its "collection," in this case, Napster did not have a "collection" of recordings because the infringing works never resided on the Napster system.  All Napster did was provide an index of works that were available to Napster users, and the court found that this was "not conclusive proof that the songs identified in the index were actually uploaded onto the network."  For the purposes of the Copyright Office's inquiry the indexing theory sheds little light on the scope of the distribution right, since there was no evidence that the music files indexed by Napster actually resided on Napster's system in a way that made them available for download.  According to the court all Napster's indexing system did was provide an information location tool.  Significantly, the court sided with plaintiffs' other theory of direct liability -- that Napster users who uploaded and downloaded the music files satisfy the direct infringement inquiry necessary to prove secondary liability.  Although the court did not clarify what rights were infringed at the appellate court level it is clear from the related 2001 decision (above) that the rights infringed were both the reproduction and the distribution rights.

Universal City Studios Productions v. Bigwood (District of Maine 2006)[28]

Defendant uploaded numerous movie files on the KaZaA peer-to-peer filing sharing system.  Movie studio plaintiffs alleged violations of their reproduction and distribution rights.  The court agreed with plaintiffs, saying that "by using KaZaA to make copies of the Motion Pictures available to thousands of people over the internet, Defendant violated Plaintiffs' exclusive right to distribute the Motion Pictures."

Arista Records v Greubel (Northern District of Texas 2006)[29]

Plaintiffs sound recording companies sued the defendant for using an online media distribution system to download copyrighted sound recordings without authorization and then distributing them to the public and defendant moved to dismiss.  Following the *Hoteling* and other decisions,

---

[28]  441 F. Supp. 2d 185 (D. Me. 2006).

[29]  53 F. Supp. 2d 961 (N.D. Tex. 2006).

the court denied the motion, holding that "Plaintiffs have done more than allege that Greubel maintained a passive indexing system of copyrighted music.  Plaintiffs assert that Greubel made the copyrighted recordings available to others without permission and actively reproduced and/or distributed the copyrighted recordings as well."  The court reasoned that "the courts have recognized that making copyrighted works available to others may constitute infringement by distribution in certain circumstances" and that "the right of distribution also has been identified as synonymous with the publication of a copyrighted work."

Warner Bros. Records v. Payne (West District of Texas 2006)[30]

Defendant uploaded numerous music files on the KaZaA peer-to-peer filing sharing system. Sound recording plaintiffs alleged violations of their reproduction and distribution rights. Defendant asked "the Court to … hold that merely "making available" copies of a work cannot constitute copyright infringement.  The Court decline[d] this invitation."  The court held that:

> listing copyrighted works on an online file-sharing system contemplates "further distribution," and thus, could constitute a violation of the copyright owner's exclusive distribution right under § 106(3).  The *Napster* court reasoned that the definition of "publication" precluded a mere file listing, without more, from constituting a § 106(3) distribution, by limiting the term to circumstances "in which 'further distribution, public performance, or public display' is contemplated." Id. at 804 (quoting 17 U.S.C. § 101). However, the Court finds that offering to distribute a music file by listing it on an online file-sharing system contemplates "further distribution." Making an unauthorized copy of a sound recording available to countless users of a peer-to-peer system for free certainly contemplates and encourages further distribution, both on the Internet and elsewhere. Therefore, the Court is not prepared at this stage of the proceedings to rule out the Plaintiffs' "making available" theory as a possible ground for imposing liability. A more detailed understanding of the Kazaa technology is necessary and Plaintiffs may yet bring forth evidence of actual uploading and downloading of files, rendering use of the "making available" theory unnecessary.

---

[30]  2006 WL 2844415, W.D. Tex., July 17, 2006 (NO. CIV.A. W-06-CA-051).

Interscope Records v Duty (District of Arizona 2006)[31]

Defendant uploaded numerous music files on the KaZaA peer-to-peer filing sharing system. Sound recording plaintiffs alleged violations of their reproduction and distribution rights.  The court denied defendant's motion to dismiss for failure to state a claim, holding that "the mere presence of a copyrighted sound recording in [defendant's] share file may constitute copyright infringement.  In reaching this decision the court explicitly disagreed with defendant's argument that "[t]here is no liability for infringing upon the right of distribution unless copies of copyrighted works were actually *disseminated* to members of the public."

Fonovisa v Alvarez (Northern District of Texas 2006)[32]

Plaintiff sound recording companies sued the defendant for using an online media distribution system to download copyrighted sound recordings without authorization and then distributing them to the public and defendant moved to dismiss for failure to state a claim.  The court held that the sound recording companies' "'making available'" theory *may* impose a possible ground for liability and thus denied the motion to dismiss.

Arista Records v Butler (Middle District of Florida 2006)[33]

Defendant uploaded numerous music files on a peer-to-peer filing sharing system.  Sound recording plaintiffs alleged violations of their reproduction and distribution rights.  Citing to the Supreme Court decision in *Grokster*, the court found that "[d]istributing copyrighted sound recordings without authorization through a peer-to-peer network such as KaZaA is a 'distribution' prohibited by the copyright act."

Elektra Entertainment v Brimley (Southern District of Georgia 2006)[34]

Defendant uploaded numerous music files on a peer-to-peer filing sharing system.  Sound recording plaintiffs alleged violations of their reproduction and distribution rights.  The court

---

[31]  2006 WL 988086, 79 U.S.P.Q.2d 1043, D. Ariz., April 14, 2006 (NO. 05CV3744-PHX-FJM).

[32]  2006 WL 5865272, N.D.Tex., July 24, 2006 (NO. CIV A 1:06-CV-011-C).

[33]  Not Reported in F.Supp.2d, 2007 WL 4557198, M.D.Fla., December 21, 2007 (NO. 8:07-CV-3-T-23EAJ).

[34]  2006 WL 2367135, S.D.Ga., August 15, 2006 (NO. CV205-134).

found "that Defendant reproduced and distributed Plaintiffs' copyrighted sound recordings. Defendant's deemed admissions establish that he downloaded Plaintiffs' sound recordings via an online media distribution system and distributed the copyrighted recordings to others by placing them in his share folder and making the recordings available to others on the peer-to-peer network.  It is clear that use of a peer-to-peer media distribution system to share music files infringes copyright."

Motown v DePietro (Eastern District of Pennsylvania 2007)[35]

Defendant uploaded numerous music files on the KaZaA peer-to-peer filing sharing system. Sound recording plaintiffs alleged violations of their reproduction and distribution rights.  The court held that "[a] plaintiff claiming infringement of the exclusive-distribution right can establish infringement by proof of actual distribution or by proof of offers to distribute, that is, proof that the defendant "made available" the copyrighted work."  The court reasoned as follows:

> While neither the United States Supreme Court nor the Third Circuit Court of Appeals has confirmed a copyright holder's exclusive right to make the work available, the Court is convinced that 17 U.S.C. § 106 encompasses such a right based on its reading of the statute, the important decision in *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001), and the opinion offered by the Register of Copyrights, Marybeth Peters, in a letter related to Congressional hearings on piracy of intellectual property on peer-to-peer networks, Letter from Marybeth Peters, Register of Copyrights, to Rep. Howard L. Berman, Rep. from the 28th Dist. of Cal. (Sept. 25, 2002) ("[M]aking [a work] available for other users of [a] peer to peer network to download ... constitutes an infringement of the exclusive distribution right, as well as the production right.").

Atlantic Recording v Anderson (Southern District of Texas 2008)[36]

Defendant uploaded numerous music files on the KaZaA peer-to-peer filing sharing system. Sound recording plaintiffs alleged violations of their reproduction and distribution rights.  After concluding that a "distribution" covers both actual distributions and offers to distribute for purposes of further distribution, the court held that "making copyrighted works available for

---

[35]  2007 WL 576284, 2007 Copr.L.Dec. P 29,339, E.D.Pa., February 16, 2007 (NO. 04 CV 2246).

[36]  2008 WL 2316551, S.D.Tex., March 12, 2008 (NO. CIVA H-06-3578).

downloading via a peer-to-peer network contemplates "further distribution," and thus constitutes a violation of the copyright owner's exclusive "distribution" right under 17 U.S.C. 106(3)." The court added that "it is self-evident that Defendant's actions in placing Plaintiffs' Copyrighted recordings in a shared folder accessible to numerous other persons on KaZaA constituted a 'distribution'…."

London-Sire Records v Doe (District of Massachusetts 2008)[37]

Sound recording companies sued defendants for infringing the distribution right in their copyrighted sound recordings by posting music files on the file-sharing networks. The court concluded that while, on the one hand an actual distribution must occur for the section 106(3) right to be infringed, on the other hand, the court can draw a reasonable inference from the complaint and the record "that where the defendant has completed all the necessary steps for a public distribution, a reasonable fact-finder may infer that the distribution actually took place." The court further explained in great detail why it "conclude[d] that § 106(3) confers on copyright owners the right to control purely electronic distributions of their work."

> [T]he Court concludes that 17 U.S.C. § 106(3) does reach [Internet transmissions]. First, while the statute requires that distribution be of "material objects," there is no reason to limit "distribution" to processes in which a material object exists throughout the entire transaction -- as opposed to a transaction in which a material object is created elsewhere at its finish. Second, while the statute addresses ownership, it is the newly minted ownership rights held by the transferee that concern it, not whether the transferor gives up his own.

Lastly, the decision also shows the faulty reasoning by the court in *Howell* case (below), by explaining why a physical copy need not "change hands" for the distribution right to be implicated.

> What matters in the marketplace is not whether a material object "changes hands," but whether, when the transaction is completed, the distributee has a material object. The Court therefore concludes that electronic file transfers fit within the definition of "distribution" of a phonorecord.

---

[37] 542 F. Supp.2d 153 (D. Mass. 2008)

**B.  *Cases Where the Court Found that the Act of Making Available was Not Necessarily Encompassed by the Distribution Right But was Otherwise Covered By Copyright Law***

Agee v Paramount Communications (Second Circuit 1995)[38]

Defendant transmitted plaintiff's sound recordings through television stations.  The Second Circuit concluded that broadcast transmissions implicate a copyright owner's public performance right, not the distribution right.  The court was "unwilling to say that disseminations must always be in physical form to constitute "distributions."

In re Aimster Copyright Litigation (Seventh Circuit 2003)[39]

In this consolidated copyright case for secondary liability against the Aimster file-sharing service, the court held that transmitting a digital file over the Internet violated the copyright owners distribution right.  It said that "[i]f the music is copyrighted, [] swapping, which involves making and transmitting a digital copy of the music, infringes copyright.  Although the court did not clearly state what rights were infringed by the "making and transmitting," it is evident that the only rights these two acts could implicate are the rights of reproduction (for the act of making) and the right of distribution (for the act of transmitting).

The court also made clear that theories of secondary liability could also be used by copyright owners to pursue those who facilitate the distribution when it said that "[f]irms that facilitate their infringement, even if they are not themselves infringers because they are not making copies of the music that is shared, may be liable to the copyright owners as contributory infringers."

Capitol Records v Thomas (District of Minnesota 2008)[40]

Defendant posted numerous music files on the KaZaA peer-to-peer filing sharing system.  The only evidence that the defendant disseminated the music files to others came from plaintiffs' agents' downloading of the files.  In determining whether the distribution right required an actual distribution, the district court here wrongly believed that it was bound by the Eight Circuit

---

[38]  114 F.3d 395 (7th Cir. 1995)

[39]  334 F.3d 643 (7th Cir. 2003)

[40]  579 F. Supp.2d 1210 (D. Minn. 2008)

decision in *National Rental Car Service v. Computer Associates* -- despite the very clear differences between the two cases.  It went on to hold that "the plain meaning of the term "distribution does not including making available and, instead, requires actual dissemination."

For the purposes of the Copyright Office's analysis of the issue it is significant that the court explained that the copyright owner is not without recourse against the person who makes these files illegally available.  As the court explained:

> A person who makes an unauthorized copy or phonorecord of a copyrighted work for the purposes of uploading it onto a peer-to-peer network, absent a defense such as fair use, violates the reproduction right. 17 U.S.C. § 106(a).  That person might also be liable for indirect infringement to the extent that her conduct caused others to engage in unauthorized reproduction, adaptation, public distribution, public performance, or public display of another's copyrighted work."

> The end user who accesses or downloads the unauthorized copy or phonorecord may be liable for direct infringement, depending on the facts of the case and the applicability of defenses, such as the fair use defense. Under certain circumstances, a person who markets products or services that can enable others to infringe or to circumvent technological measures that control or restrict access to copyrighted works also may be liable for indirect infringement or for violation of the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201(a)(2), (b).

> Finally, while the Court does not adopt the deemed-disseminated theory based on *Hotaling*, it notes that direct proof of actual dissemination is not required by the Copyright Act. Plaintiffs are free to employ circumstantial evidence to attempt to prove actual dissemination. Overall, it is apparent that implementation of Congress's intent through a plain meaning interpretation of § 106(3) will not leave copyright holders without recourse when infringement occurs over a peer-to-peer network.

### C.  Cases in Which the Court Fails to Clearly Explain the Scope of or Clearly Apply the Distribution Right

<u>Arista Records v MP3Board (Southern District of New York 2002)</u>[41]

Plaintiff sound recording companies sued defendant MP3Board for secondary liability for providing users with links to pirated copies of copyrighted music files.  The court ambiguously held that "to show unlawful distribution of a copyrighted work pursuant to 17 U.S.C. § 106(3), the record companies must show that an unlawful copy was *disseminated* 'to the public'" and that "…a copyright holder may not be required to prove particular instances of *use* by the public."  (emphasis added).  This decision is of no help in the Copyright Office analysis because: (i) no other court, nor does the statute, require *use* by the public to prove that a distribution has occurred, and (ii) the scope and meaning of the term "dissemination" by the court is also unclear.

<u>Interscope Records v Leadbetter (Western District of Washington 2007)</u>[42]

Sound recording companies sued defendant for posting music files on the KaZaA file-sharing system.  The court concluded that it did not need to decide the issue of whether defendant's mere listing of the file names of the music files in her shared folder where they were being made available for download over the KaZaA network constitutes infringement of the distribution right because plaintiffs submitted proof showing that several copyrighted music files were actually disseminated from the shared folder.

<u>Elektra Entertainment Group v Barker (Southern District of New York 2008)</u>[43]

Sound recording companies sued defendant for posting music files on the KaZaA file-sharing system.  The court concluded that, based on the legislative history, "the distribution right of 106(3) may be infringed by '[t]he offer[ ] to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display,'"  However, the Court was hesitant to equate "this avenue of liability with the contourless 'make available' right proposed by Plaintiff."  Plaintiff's complaint only alleged that defendant made available the

---

[41]  WL 1997918, 2002 Copr.L.Dec. P 28,483, S.D.N.Y., August 29, 2002 (NO. 00 CIV. 4660 (SHS)).

[42]  2007 WL 1217705, W.D.Wash., April 23, 2007 (NO. C05-1149-MJP-RSL)

[43]  551 F.Supp.2d 234 (S.D.N.Y 2008)

music files, but did not plead that defendants made an offer to distribute and that offer was for purposes of further distribution.  The court then granted plaintiffs thirty days to amend their complaint to allege defendant's offer to distribute for purposes of further distribution.

<u>Atlantic Recording v Brennan (District of Connecticut 2008)</u>[44]

Plaintiffs sound recording companies sued the defendant for using an online media distribution system to reproduce and distribute copyrighted sound recordings without authorization.  When the defendant failed to respond, plaintiffs moved for default judgment and the court applied the three-part test to determine whether default was appropriate.  In evaluating the second prong of this test – whether defendant might have a *possible* meritorious defense[45] – the court concluded that the defendant might be able to challenge the distribution infringement claims.  However, it made no determination as to whether such a challenge would ultimately be successful.

### D.  Cases Holding Distribution Right Does Not Encompass Acts of Making Available

<u>National Car Rental System v. Computer Associates International (Eighth Circuit 1993)</u>[46]

Copyright owner, Computer Associates (CA), licensed its software to National Car Rental System (National) with the restriction that it and its independent contractor, EDS, use the software only for National's internal operations and to only process National's data.  When CA learned that National and EDS were using the software to process the data of third parties in violation of the license agreement and threatened to sue, National brought a declaratory judgment action of non-infringement against CA.  In the context of determining the scope of CA's pleadings, the 8th Circuit concluded that CA did not assert that National violated its distribution right because:

> First, the contract provisions CA alleges are at issue place limits upon the way those in rightful possession of a copy of the program can use that copy.  The provisions do not prohibit National or EDS from giving a copy

---

[44]  534 F. Supp. 278 (D. Con 2008)

[45]  In determining whether there is a possible meritorious defense, the court explained that the court need only find that there exists something "more than a mere conclusory denial"   -- which does "not demand a high showing."  *Id*. at 282.

[46]  991 F.2d 426, 434 (8th Cir.), *cert. denied*, 510 U.S. 861 (1993).

of the program to anyone else.  Second, CA does not specifically allege that National gave a copy of the program to [the third parties].  CA alleges that "National has used and permitted the use of the Licensed Programs for the processing of data for the benefit of third parties."  CA did not allege use by [the third parties], but instead alleged use for their benefit.

The only potential allegation of unauthorized distribution comes in CA's contention that National "permitted the use" of the programs.  Because we must give CA the benefit of all reasonable inferences from the pleadings, we cannot conclude that an allegation that National "permitted the use" necessarily amounts to an allegation of the actual distribution of a copy of the program.

The issue also arose in the context of the court determining whether CA's licensing claims were preempted by the Copyright Act.  The court concluded that there was no preemption because the "the contractual restriction on use of the programs constitute[d] an additional element making this cause of action not equivalent to a copyright action."  The court then held that "making the programs available for use *for* third parties did not constitute distribution." (emphasis added)

This case is distinguishable from other cases determining the scope of the distribution right.  In this case, CA's claims involved the improper *use* of its software.  Since a copy of the software was not transferred or offered to the third parties nor made available for them to use or access themselves, the court never had to draw a line between what is a distribution of the software as compared to what is making available of the software.  Consequently, for the purposes of the Copyright Office's inquiry, this case should have no bearing on whether the making available of a copyrighted work is subsumed by the section 106 distribution right.

Obolensky v G.P. Putnam (Southern District of New York 1986)[47]
The parties had been in negotiations for defendant to sell plaintiff's book.  With plaintiff's knowledge and consent, the defendant listed the book in its sales catalogue and received (but did not fulfill) order requests.  When negotiations between the parties fell apart, defendant notified its sales force to stop offering the book for sale and cancelled all orders for the book.  As a result, defendant never made any copies of the book, never sold any copies and never had possession, custody or control of any copies of the book.  In determining whether the defendant infringed

---

[47]  628 F. Supp. 1552 (S.D.N.Y. 1986)

plaintiff's distribution right the court noted that "[t]he courts have held that there is no violation of the right to vend copyrighted works under the predecessor federal copyright statute where the defendant offers to sell copyrighted materials but does not consummate a sale; equally, there is no infringement of the vending right where there is copying, but no sale of the material copied. The present case poses a situation in which there was neither copying nor a sale, and plaintiffs have failed to state a cognizable claim for the violation of their right to distribute the Book."

This case has virtually no applicability to the "making available" cases in the digital environment.  First, unlike most of the other cases referenced in these comments, in this case, the defendant never had the *capacity* to distribute the copyrighted work because it never possessed a copy.  Second, unlike the digital distribution cases referenced above, the defendant in this case would have had to take additional steps to distribute the book.  When a person uploads the work through a file sharing service, that person has done everything it is capable of doing to complete the distribution.  Once the work has been uploaded, whether the work is downloaded by another person is entirely out of the uploader's control.  That is not true in this case.  In the *Obolensky* case, the defendant would have had to take numerous additional steps to fulfill the orders and complete the distribution.

Atlantic Recording v. Howell (District of Arizona 2008)[48]

Sound recording companies sued defendants for posting music files on the KaZaA file-sharing system.  Defendants admitted using KaZaA and authorizing the sharing of certain files through KaZaA, but denied placing the music files in the KaZaA shared folder where other users could access them.  The district court of Arizona concluded that section 106(3) "is not violated unless the defendant has actually distributed an authorized copy of the work to a member of the public." It explained that "[u]nless a copy of the work changes hands in one of the designated ways, a 'distribution' under § 106(3) has not taken place.  Merely making an unauthorized copy of a copyrighted work available to the public does not violate a copyright holder's exclusive right of distribution."

---

[48]  554 F. Supp.2d 976 (D. Ariz 2008).

The court's view in  this case that a physical copy must *change hands* is both incorrect and antiquated and is unlikely to be followed by other courts.  Although section 106(3) of the Copyright Act does require a "transfer of ownership," it does not require "transfer of a copy," as was required by the *Howell* court.  In the digital environment one can transfer ownership without transferring a physical copy.  For example, if a copyright owner sells (rather than licenses) a copyrighted work that resides in the cloud and is made accessible by the purchaser through an access code, that purchaser can transfer his ownership of the work by selling the access code to a third party.  This act will transfer ownership without transfer of a copy and no physical copy will have ever "changed hands."  It is important to understand that the section 106 requirement that there be a "transfer" does not apply to "rental, lease or lending."  Thus, this case is narrowly targeted to sale of copyrighted works and should have no applicability to the licensing of a copyright work.  Lastly, it should be pointed out that this is only a district court case, whereas there are several appellate court cases that hold contrary to *Howell*.

## IV.    OTHER RELEVANT CASES, LEGISLATIVE HISTORY AND SECONDARY SOURCES RELATING TO THE MAKING AVAILABLE RIGHT

In addition to aforementioned cases and statutory provisions, there are various other cases that are indirectly relevant to the Copyright Office inquiry.  Legislative history and other secondary sources also help to better determine the intended scope of the distribution right and whether it includes acts of making available.

### A.  *Other Relevant Cases*

The Supreme Court case of *Harper & Row v Nation Enterprises*[49] did not directly address the scope of the distribution right in the context of acts of making available.  However, it is relevant to the Copyright Office inquiry because it explicitly found that section 106(3) of the Copyright Act vests copyright owners with the right to control the first distributions of their works.[50]  If a

---

[49]  471 U.S. 539 (1985)

[50]  *Id*. at 555 (stating that "[t]he Copyright Act, which accords the copyright owner the "right to control the first public distribution" of his work, House Report, at 62, echos the common law's concern that the author or copyright

distribution required a physical transfer of a copy of a copyrighted work then, in certain circumstances, it might be impossible for the copyright owner to truly control the first distribution of the copy.

For example, if a copyright owner grants iTunes the exclusive right to distribute a new song before the song is made available to other venders to sell what they have really granted to iTunes is the exclusive right to make the song available for sale.  Neither the copyright owner nor iTunes can control whether anyone actually purchases/downloads the song.  Similarly, if a software company makes its new software program available in the cloud before making "box" copies available, it is exercising its right to control the manner in which it *first* distributes the copyrighted software – even though there is no physical "changing of hands" of the software.  If that were not the case, then a person could take a legitimate copy of a cloud-only release of a software title and make it available in his or her own cloud without being liable for a violation of the distribution right.[51]

There are other early making available cases that are relevant but only somewhat helpful to the Copyright Office inquiry because the court did not directly address the issue of whether an act of making available fell within the distribution right or its discussion of the issue was dicta.  For example, in the *Playboy v. Frena* case, a district court in Florida said in dicta that the copyrighted photos posted on the Internet implicated Playboy's distribution right.[52]

### B.  Legislative History and Other Sources

In the Congressional reports accompanying passage of the 1976 Copyright Act, there are many instances in the Senate and House Reports where the two bodies considered the terms "distribution" and "publication" to be synonymous.  For example, in describing the exclusive

---

owner retain control throughout this critical stage" and that "[t]he author's control of first public distribution implicates not only his personal interest in creative control but his property interest in exploitation of prepublication rights, which are valuable in themselves and serve as a valuable adjunct to publicity and marketing.")

[51]  Of course, the person may still be liable for making an illegal reproduction.

[52]  *Playboy Enters., Inc. v. Frena,* 839 F. Supp. 1552 (M.D. Fla 1993).  See also *Playboy Enters., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543 (N.D. Tex. 1997).

rights both the Senate and House referred to them as "the exclusive rights of reproduction, adaptation, *publication*, performance and display."[53] (emphasis added).  More specifically, in referencing section 106(3), House Report states that "[c]lause (3) of section 106, establishes the exclusive right of publications. . . . Under this provision the copyright owner would have the right to control the first public distribution of an authorized copy . . . of his work."  House Report, at 62.

The significance of the relationship between the "distribution" and the "publication" is important because, while there is no definition of distribution in the Act there is a definition of publication in the Act and that definition includes both acts of distribution and offers to distribute.

Former Register of Copyrights, Marybeth Peters also made clear her views that acts of making available were subsumed by the distribution right when she said before Congress that "making [a work] available for other users of [a] peer to peer network to download. . . constitutes an infringement of the exclusive distribution right, as well as the reproduction right."[54]

Lastly, in the oft-cited treatise *Nimmer on Copyright*, the author explains that "[n]o consummated act of actual distribution need be demonstrated . . . to implicate the copyright owner's distribution right."[55]

## CONCLUSION

Based on our review of the language of the Copyright Act, the case law applying and interpreting the Act and other secondary sources, we conclude that the right of making available is adequately and effectively addressed under U.S. law through a combination of the exclusive rights of reproduction, distribution and display in section 106 of the Copyright Act, theories of secondary copyright liability applied by the courts, the anti-circumvention provisions in section

---

[53]  H.R. No. 94-1476, at 61 (1976); S. Rep. No 94-473 at 57 (1976).

[54]  *See* Letter from Marybeth Peters, Register of Copyrights, to Rep. Howard L. Berman, Rep. from the 28th Dist. of Cal. (Sept. 25, 2002).

[55]  2 Melville Nimmer & David Nimmer, Nimmer on Copyright Section 8.11 [B][4][d] at 8-154.10 (2013).

1201 of the Digital Millennium Copyright Act (DMCA), other federal laws, such as the Computer Fraud and Abuse Act (CFAA) and various state laws.  Accordingly, we do not believe that legislation or any type of further Congressional clarification is needed to provide for a making available right under U.S. law.

To the extent it can be argued that the right of making available is not adequately addressed by U.S. law, we believe this has more to do with ambiguities with the definition of "making available" than the scope and application of U.S. copyright law.  The case law and statute clearly establish that the distribution right in section 106(3) of the U.S. Copyright Act covers the making available of a copyrighted work provided: (i) the transferor has completed all the necessary steps for a public distribution and the only step(s) necessary for a "transfer in ownership" (as required by the statute) are those that must be undertaken by the transferee or other third party; and (ii) the alleged infringer must have the capacity to transfer a copy of the copyrighted work by possessing a copy of the copyrighted work alleged to be infringed.

As can be seen from the case law, uploading a copyrighted work to a peer-to-peer file sharing system is deemed to implicate a copyright owner's distribution right because the uploader has completed all the necessary steps for a public distribution.[56]

On the other hand, where the alleged infringer is merely providing the means for person A to transfer a copy to person B or is merely directing a potential transferee to a potential transferor and the alleged infringer does not actually possess a copy of the work being transferred, such acts are insufficient for the alleged infringer to be held liable for violating the distribution right under the section 106(3).[57]  That does not mean that the copyright owner is not without potential recourse in this situation.  Where a party is providing the means for transferring infringing works or indexing or directing members of the public to infringing material, liability may be established under section 1201 of the Copyright Act and/or theories of secondary copyright liability.  Therefore, to the extent that the scope of "making available" is intended to also cover instances

---

[56]  See cases cited in section A of these comments.

[57]  See cases cited in sections B and D of these comments.

where the alleged infringer does not possess a copy of the copyrighted work to transfer but somehow assists with the transfer, U.S. copyright law would also adequately and effectively cover such acts -- just not under the section 106(3) distribution right.[58]

The copyright owner's reproduction right also would apply to instances where the making available of a copyrighted work is conducted through a digital transmission.  In the analog world, the reproduction right is not implicated by a distribution of an authorized copy of the work.  However, in the digital environment when a copy is transmitted from person A to person B, the copy that resides with person B is a new digital copy and both A and B have copies.  Thus, even though the copy possessed by person A may have been authorized, the resulting transmission has resulted in an unauthorized copy in violation of the copyright owner's reproduction right.

Consequently, even if a court were to determine that the transmission of a copyrighted work was not a violation of the distribution right or that such distribution is permitted under the first sale defense in section 109 of the Act, the making available of the copyrighted work through a transmission would be considered to be an infringement of the reproduction right under section 106(1).[59]  Of course, any change in the law to enact a digital first sale defense would change this analysis and, as a result, might require amending the distribution right to encompass making available of copyrighted works through digital transmission to ensure that the United States continues to comply with its international obligations.

The performance and display rights may also be implicated for certain type of acts of making available.  For example, where copyrighted content, like a magazine article or the contents of a

---

[58]  To be clear, SIIA does not believe that merely providing the means for a person to transfer a copy to another person or merely directing a potential transferee to a potential transferor should constitute an act of making available because the party providing such means or direction does not actually possess a copy of the work being transferred and therefore is incapable of making the work available.  We believe that theories of secondary copyright liability – including the exceptions to such theories, like the *Sony Betamax "substantially noninfringing uses" exception* – are best suited to determine potential liability in such instances.

[59]  See, e.g., *Capitol Records, LLC v. ReDigi Inc.*, 934 F.Supp.2d 640 (S.D.N.Y. 2013) (stating that "the reproduction right is necessarily implicated when a copyrighted work is embodied in a new material object, and because digital music files must be embodied in a new material object following their transfer over the Internet, the Court determines that the embodiment of a digital music file on a new hard disk is a reproduction within the meaning of the Copyright Act" and that "ReDigi is not distributing such material items; rather, it is distributing reproductions of the copyrighted code embedded in new material objects")

book, are posted online and made publicly available on a website without the copyright owner's authority, the person who made the content publicly available may be liable for violating both the copyright owner's reproduction and display rights.[60]  Taking this example on step further; if the person who made the content available had authority from the copyright owner to post it on the website but the copyright owner required that person to limit access to the content in some fashion (*i.e.*, not to make it publicly available) and he or she failed to do so, that person may be liable for violating the display right, but not the reproduction right.

While most, if not all, acts of making available are effectively addressed by U.S. copyright law, it may be possible that some are not.  For those few scenarios where a making available occurs that is not covered by sections 106 or 1201 of the Copyright Act or theories of secondary copyright liability, there are a patchwork of other federal and state laws that provide adequate coverage.

Based on our analysis, SIIA strongly believes that, at this time, neither legislation nor any type of further Congressional clarification is needed to provide for a making available right under U.S. law.  Of course, new technologies, new businesses and new court cases are arising every day.  So too are new ways of engaging in unauthorized acts of making available.  SIIA will continue to monitor for any dramatic shifts in the copyright landscape that would alter the views voiced in these comments.  We therefore reserve the right to change our view as to whether legislation or a congressional clarification is needed in the event such radical changes occur in the future.

We would like to thank the Copyright Office for giving us the opportunity to participate in this process and to submit these comments.  Any questions or requests for additional information about these comments can be directed to Keith Kupferschmid, SIIA's General Counsel and Senior Vice President for Intellectual Property, at (202) 789-4442 or keithk@siia.net.

---

[60]  Of course, there may be an applicable copyright exception like fair use that would permit such acts.